**No. 25-40026**

―――――――――――――――――

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

―――――――――――――――――

UNITED STATES OF AMERICA,
*Plaintiff–Appellant,*

v.

CONCEPCION GERARDO PALOMARES,
*Defendant–Appellee.*

―――――――――――――――――

On Appeal from the United States District Court
For the Southern District of Texas
Laredo Division, Case No. 5:24-CR-00811

―――――――――――――――――

BRIEF OF PLAINTIFF–APPELLANT

―――――――――――――――――

NICHOLAS J. GANJEI
United States Attorney

CARMEN CASTILLO MITCHELL
Chief, Appellate Division

KRISTIAN D. AMUNDSEN
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
(713) 567-9102

ATTORNEYS FOR APPELLANT

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Fed. R. App. P. 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.  District Judge: Hon. John A Kazen.

2.  Magistrate Judges: Hon. Diana Song Quiroga; Hon. Christopher dos Santos.

3.  Defendant-Appellee: Concepcion Gerardo Palomares.

4.  Plaintiff-Appellant: United States of America.

5.  Counsel for Plaintiff-Appellant: United States Attorney Nicholas J. Ganjei; Former United States Attorney Alamdar S. Hamdani; Assistant United States Attorney Leslie Ann Cortez; Former Assistant United States Attorney Anna Kalluri; Assistant; United States Attorney Carmen Castillo Mitchell (on appeal) and Assistant United States Attorney Kristian D. Amundsen (on appeal).

6.  Counsel for Defendant-Appellee: Federal Public Defender Philip G. Gallagher; Assistant Federal Public Defender Arturo Villarreal, III; Assistant Federal Public Defender Evan Gray Howze (on appeal).

s/ *Kristian D. Amundsen*
Kristian D. Amundsen
Assistant United States Attorney
Attorney of record for the United States

i

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary. The record and briefs adequately present the facts and legal arguments to resolve this appeal. Fed. R. App. P. 34(a)(2)(C).

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS.............................................i

STATEMENT REGARDING ORAL ARGUMENT ..................................ii

TABLE OF AUTHORITIES..................................................................v

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF THE ISSUE.............................................................1

STATEMENT OF THE CASE .............................................................1

    I.    Course of the Proceeding Below ...............................................1

    II.    Relevant Factual History.........................................................3

        a.    Palomares's Motions to Dismiss.....................................3

        b.    The Government's Opposition ........................................4

        c.    Palomares's Reply........................................................6

        d.    The Motion Hearing......................................................7

        e.    The District Court's Order.............................................7

SUMMARY OF ARGUMENT.............................................................9

ARGUMENT......................................................................................10

    I.    The Standard of Review........................................................10

    II.    The Second Amendment and Felons Generally....................11

# TABLE OF CONTENTS, cont'd

**Page**

III.   Palomares's as-applied challenge should have failed because he was convicted of an inherently dangerous felony...............................................................................12

IV.   Alternatively, Palomares's as-applied challenge should fail because he was convicted of a crime analogous to a crime that was severely punished at the time of Founding.................................................................................17

CONCLUSION ....................................................................................24

CERTIFICATE OF SERVICE................................................................25

CERTIFICATE OF COMPLIANCE .......................................................26

## TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Colonial Oaks Assisted Living Lafayette, L.L.C. v. Hannie Dev., Inc.*,
   972 F.3d 684 (5th Cir. 2020) ........................................................17

*District of Columbia v. Heller*, 554 U.S. 570 (2008)................................11

*Ex Parte Gordon*, 66 U.S. 503 (1861).....................................................20

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ...................................12, 13

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).....11, 21

*United States v. Barrow*, No. 24-40455, 2025 WL 1984267
   (5th Cir. July 17, 2025) (unpublished) ..........................................11

*United States v. Betancourt*, 139 F.4th 480 (5th Cir. 2025) ...................23

*United States v. Bullock*, 123 F.4th 183 (5th Cir. 2024).......10, 12, 22, 23

*United States v. Clark*, --- F.4th ----, 2025 WL 2417117
   (5th Cir. Aug. 21, 2025)................................................................10

*United States v. Contreras*, 125 F.4th 725 (5th Cir. 2025) ....................18

*United States v. Davis*, 108 F. App'x 131 (5th Cir. 2004)
   (unpublished).................................................................................17

*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) *cert. denied*,
   No. 24-6625, 2025 WL 1727419 (June 23, 2025)....................*passim*

*United States v. Duarte*, 137 F.4th 743 (9th Cir. 2025).........................12

*United States v. Dubois*, 139 F.4th 887 (11th Cir. 2025).......................12

*United States v. Garcia-Guerrero*, 313 F.3d 892 (5th Cir. 2002)............16

## TABLE OF AUTHORITIES, cont'd

<u>**Cases**</u>                                                           <u>**Page(s)**</u>

*United States v. Harrison*, No. 23-6028, 2025 WL 2452293
(10th Cir. Aug. 26, 2025) ..................................................................23

*United States v. Hunt*, 123 F.4th 697 (4th Cir. 2024), *cert. denied*,
No. 24-6818, 2025 WL 1549804 (June 2, 2025) .............................12

*United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024) .....................12

*United States v. Jurado-Garcia*, 2018 WL 1411260
(S.D. Tex. Mar. 21, 2018), *aff'd*, 775 F. App'x 175
(5th Cir. 2019) (unpublished) ...........................................................13

*United States v. Kimble*, 142 F.4th 308 (5th Cir. 2025) ........ 10, 12, 13, 15

*United States v. LeBlanc*, No. 24-30036, 2025 WL 2218881
(5th Cir. Aug. 5, 2025) (unpublished) ......................................17, 24

*United States v. Mateo Garza*, 541 F.3d 290 (5th Cir. 2008) .................16

*United States v. Mendez*, 431 F.3d 420 (5th Cir. 2005) ....................13, 17

*United States v. Morgan*, --- F.4th ----, 2025 WL 2233205
(5th Cir. Aug. 6, 2025) .....................................................................10

*United States v. Rahimi*, 602 U.S. 680 (2024) ............................12, 20, 21

*United States v. Schnur*, 132 F.4th 863 (5th Cir. 2025) ........................13

*United States v. Solis-Garcia*, 420 F.3d 511 (5th Cir. 2005) .................16

*Vincent v. Bondi*, 127 F.4th 1263 (10th Cir. 2025) ...............................12

*Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025) ........................................12

# TABLE OF AUTHORITIES, cont'd

**Rules and Statutes**                                                              **Page(s)**

Fed. R. App. P. 4(b)(1)(B)(i) ...................................................................... 1

Fed. R. App. P. 28.2.1 ................................................................................. i

Fed. R. App. P. 34(a)(2)(C) ....................................................................... ii

Fed. R. Evid. 201(b) ................................................................................. 17

5th Cir. R. 28.2.2 ........................................................................................ 1

U.S. Const. amend. II ........................................................................ *passim*

U.S. Const. art. 1, § 9, cl. 1 ..................................................................... 20

8 U.S.C. § 1324(a)(1)(A)(ii) ............................................................... 1, 8, 9

18 U.S.C. § 922(g)(1) ......................................................................... *passim*

18 U.S.C. § 1589 ........................................................................................ 8

18 U.S.C. § 1590 ........................................................................................ 8

18 U.S.C. § 3231 ........................................................................................ 1

18 U.S.C. § 3731 ........................................................................................ 1

**United States Sentencing Guidelines**

U.S.S.G. § 2L1.1(b)(1) ............................................................................. 16

U.S.S.G. § 2L1.1(b)(2) ............................................................................. 16

U.S.S.G. § 2L1.1(b)(3) ............................................................................. 16

## TABLE OF AUTHORITIES, cont'd

**United States Sentencing Guidelines**        **Page(s)**

U.S.S.G. § 2L1.1(b)(4) ....................................................................... 16

U.S.S.G. § 2L1.1(b)(5) ....................................................................... 16

U.S.S.G. § 2L1.1(b)(6) ....................................................................... 16

U.S.S.G. § 2L1.1(b)(7) ....................................................................... 16

U.S.S.G. § 2L1.1(b)(8) ....................................................................... 16

U.S.S.G. § 2L1.1(b)(9) ....................................................................... 16

**Other Authorities**

Final Presentence Investigation Report, *United States v. Palomares*, No. 2:21-CR-690-1 (S.D. Tex., Nov. 08, 2021) (Dkt. No. 26) ........................................................................................ 17

Addendum to the Final Presentence Investigation Report, *United States v. Palomares*, No. 2:21-CR-690-1 (S.D. Tex., Nov. 08, 2021) (Dkt. No. 27) ....................................................................... 17

Act of Mar. 2, 1807, ch. 22, 2 Stat. 426 (1807) ............................. 5, 19, 20

Act of Mar. 3, 1819, ch. 101, 3 Stat. 532 (1819) ................................. 5, 19

Act of May 15, 1820, ch. 113, 4 Stat. I (1820) ............................... 5, 19, 20

An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 113, Secs. 3 (1790) .......................................... 22

An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 113, Sec. 7 (1790) ........................................... 22

# TABLE OF AUTHORITIES, cont'd

**Other Authorities**                                                       **Page(s)**

An Act for the Punishment of Certain Crimes Against the United
 States, ch.9, § 9, 1 Stat. 112, 114 (1790) .......................................20

The Offences against Customs or Excise Act, 19 Geo. 2. c. 34 (1745)....20

Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave
 Trade Legislation, and the Origins of Federal Immigration
 Regulation*, 54 U.C. Davis L. Rev. 2215 (2021).............................19

Katherine Drabiak, *How Distorting Asylum Law Affects Health &
 Safety at the Border,How Distorting Asylum Law Affects
 Health & Safety at the Border*, 22 Ind. Health L. Rev. 215
 (2025) ................................................................................................16

Marshall B. Lloyd, *Los Vaqueros, Coyoteros, y Pollos: Combating
 Human Smuggling Beyond the Border*, 58 Tulsa L. Rev. 245
 (2023) ................................................................................................14

Aaron M. Munoz, *Silver, Secret Drug Wars, & Selfies: The United
 States' Justification for the Use of Force Against the Mexican
 Drug Cartels*, 41 W. State Univ. L. Rev. 643, 646 (2014)..............14

Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-
 Dollar Business*, The N.Y. Times (July 25, 2022),
 https://www.nytimes.com/2022/07/25/us/migrant-smuggling-
 evolution.html..................................................................................15

Grayson Quay, *The Dangerous Journeys of Undocumented
 Migrants*, The Week (June 29, 2022),
 https://theweek.com/immigration/1014718/the-dangerous-
 journeys-of-undocumented-migrants ..............................................15

# TABLE OF AUTHORITIES, cont'd

**Other Authorities**                                                    **Page(s)**

Edgar Sandoval, *A Chilling Scream, Then the Discovery of 53 Dead and Dying Migrants*, The NY Times (Mar. 13, 2025), https://www.nytimes.com/2025/03/13/us/politics/migrants-smugglers-trial.html ...................................................................14

## STATEMENT OF JURISDICTION

This is an appeal by the United States of a district court order dismissing the first count of an indictment in a criminal case. ROA.101-06.[1] The district court (Kazen, J.) had subject matter jurisdiction over the case pursuant to 18 U.S.C. § 3231. This Court has jurisdiction over the appeal pursuant to 18 U.S.C. § 3731.

The district court entered its order on December 20, 2024. ROA.101. The government filed a notice of appeal on January 17, 2025. ROA.121. The notice of appeal is timely. 18 U.S.C. § 3731; Fed. R. App. P. 4(b)(1)(B)(i).

## STATEMENT OF THE ISSUE

Is 18 U.S.C. § 922(g)(1) constitutional under the Second Amendment as applied to Palomares, a felon previously convicted of transporting an illegal alien in violation of 8 U.S.C. § 1324(a)(1)(A)(ii)?

## STATEMENT OF THE CASE

### I.　Course of the Proceeding Below

The Grand Jury for the Southern District of Texas charged Palomares in an eight count indictment with unlawful possession of a

---

[1] "ROA" refers to the record on appeal, which is cited in accordance with 5th Cir. R. 28.2.2.

1

firearm as a felon, unlawful possession of a machine gun, unlawful possession of a firearm made in violation of the National Firearms Act [NFA], unlawful possession of an unregistered firearm, unlawful transfer of a firearm in violation of the NFA, making a firearm in violation of the NFA, unlawful possession of a firearm unidentified by a serial number, and smuggling goods from the United States. ROA.34-39.

Palomares filed a motion to dismiss Count One of that indictment, unlawful possession of a firearm as a felon, arguing 18 U.S.C. § 922(g)(1) violates the Second Amendment. ROA.52-56. The parties requested, and the district court permitted, that that motion be held in abeyance while this Court considered the constitutionality of § 922(g)(1) in *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), *cert. denied,* No. 24-6625, 2025 WL 1727419 (June 23, 2025). ROA.195-208. After this Court issued its decision in *Diaz*, Palomares filed an amended motion. ROA.74-85. The government opposed that motion, ROA.86-94, and Palomares filed a reply. ROA.95-98.

The district court held a hearing addressing Palomares's motion. ROA.241-59. It then entered a written order dismissing Count One and

2

ruling that § 922(g)(1) was unconstitutional as applied to Palomares. ROA.101-06. This appeal ensued.

## II.    Relevant Factual History

### a.    Palomares's Motions to Dismiss

In initially moving to dismiss the § 922(g)(1) count of the indictment, Palomares adopted the position that "the historical record only supports disarming individuals convicted of *inherently dangerous* felonies." ROA.53. He contended that his prior conviction for transport of an illegal alien was a "non-violent" felony. ROA.53. Palomares concluded that § 922(g)(1) "is facially unconstitutional because it violates the Second Amendment as applied to [him] because he is a 'non-violent' offender." ROA.54.

Palomares then amended his as-applied challenge in light of this Court's decision in *Diaz.* ROA.79-81.[2] Specifically, he argued that "in the Founding Era, there were no analogous crimes [to transporting illegal aliens] subject to the death penalty or forfeiture of estate." ROA.80.

---

[2] Additionally, Palomares added an argument that § 922(g)(1) violates the Commerce Clause. ROA.75-79. He also made clear that he was raising a separate facial challenge to the statute under the Second Amendment in addition to his as-applied challenge. ROA.79-84.

Palomares acknowledged the "United States began regulating immigration soon after it won independence[,]" ROA.80, but argued "similar conduct" to transporting aliens "was not even criminal" at the Founding, ROA.81. He asserted it was not until "roughly 150 years ago" that "bringing aliens into the United States was first criminalized." ROA.81. And he noted the Immigration Act of 1875, which prohibited the immigration of criminals and made bringing to the U.S. or contracting forced Asian laborers a felony, and the 1891 Immigration Act, which made it a federal misdemeanor to bring unauthorized immigrants into the country or aid someone who is entering the U.S. unlawfully, did not penalize these crimes with the death penalty or estate forfeiture. ROA.81. Therefore, Palomares concluded § 922(g)(1) violated the Second Amendment as applied to himself because his prior felony conviction would not have been severely punished at the time of the Founding. ROA.80-81.

### b.    The Government's Opposition

In response, the government argued § 922(g)(1) "is constitutional as applied" because Palomares "has been convicted of a federal human

trafficking felony…which is analogous to founding era laws that severely penalized human smuggling." ROA.86.[3]

First, the government argued that § 922(g)(1) is constitutional in all applications, because all felons can be disarmed as a category, and, therefore, was not subject to as-applied challenges under the Second Amendment. ROA.87-89.

Next the government argued Palomares's as-applied challenge should fail because his felony conviction was analogous to crimes that were severely punished at the Founding. ROA.89-92. Laws from soon after the Founding prohibited the transporting of people of color into the United States for purposes of making them slaves, called for the deportation of those smuggled into the country, and punished the smuggler with death. ROA.90 (citing Act of Mar. 2, 1807, ch. 22, 2 Stat. 426 (1807), Act of Mar. 3, 1819, ch. 101, 3 Stat. 532 (1819), Act of May 15, 1820, ch. 113, 4 Stat. I (1820)). The government explained that these statutes were analogous to modern day bans on human trafficking and human smuggling because 1) these laws criminalize the smuggling of

---

[3] The government also argued that Palomares's Commerce Clause argument and Second Amendment facial challenge were foreclosed. ROA.87, 92-93.

foreigners and 2) those foreigners could be deported if found in the United States. ROA.91. Moreover, individuals engaged in the slave trade for profit and many individuals today transport aliens for profit. ROA.91.

While the nature of these crimes and the circumstances they intended to address certainly differ, the government argued that the Supreme Court does not require "dead ringers" for historical laws and noted the demand for "overly specific analogues [would] have serious problems." ROA.91 (quotations and citations omitted). The government concluded that Palomares's as-applied challenge should be denied considering "the similarities between modern human trafficking laws and founding-era human smuggling laws and the fact that human smuggling was punished by death around the time of the founding." ROA.92 (citing *Diaz*, 116 F.4th at 471).

### c.   **Palomares's Reply**

Palomares filed a short reply, arguing that the government had not demonstrated disarming a "non-violent citizen" was consistent with the nation's history and tradition. ROA.95-96. He stated that "[w]hile the Trans-Atlantic Slave Trade involved smuggling non-citizen persons, the

offense of transporting undocumented non-citizens for profit within the United States is not a close analogue." ROA.96.

### d.    The Motion Hearing

The district court held a hearing to allow for further argument related to the pending motions. ROA.241-59. The prosecutor re-urged the arguments made in the government's opposition to the motion to dismiss. ROA.247-50. In addition, she highlighted that human smuggling and trafficking offenses tend to involve the exploitation of the alien and violence toward the alien. ROA.253-54. The prosecutor argued that the district court need not consider the specifics of each human smuggling conviction. ROA.253-54. Defense counsel reiterated his position that Palomares's conviction was not analogous to a severely punished Founder-era felony. ROA.256-58.

### e.    The District Court's Order

The district court issued a written order dismissing the first count of the indictment. ROA.101-06.[4] After recounting *Diaz*, ROA.102, the district court began to analyze the government's argument that

---

[4] The district court began by denying Palomares's Commerce Clause argument. ROA.101-02. It later noted that Palomares's facial Second Amendment challenge was also foreclosed. ROA.103.

Palomares's conviction for transporting illegal aliens was analogous to felonies severely punished at the Founding. ROA.102-06.[5] It rejected that argument because the "differences between the historical laws criminalizing the slave trade and the modern crime of transporting aliens under § 1324(a)(1)(A)(ii) are too significant." ROA.103-04.

The district court first stated historical slave trade laws "prohibited bringing kidnapped people into the country as slaves" while "bringing of aliens into the United States is not an element of Palomares' predicate felony." ROA.104. Section 1324(a)(1)(A)(ii) "involves transporting undocumented aliens *within* the United States." ROA.104 (emphasis in original). According to the district court, "if the transporting of aliens within the United States really was analogous to the slave trade, the person could still be charged for the federal law of trafficking slaves" under 18 U.S.C. §§ 1589, 1590. ROA.104. And the district court reasoned that "transporting aliens within the United States generally involves aliens who have voluntarily entered or remained in the country and have paid for the service of being transported." ROA.104 (citation omitted).

---

[5] The district court stated the government did not argue that "that Palomares' predicate felony offense of transporting aliens makes him a danger to the community." ROA.103.

8

Further, the district court stated slave trade laws were "akin to piracy[,]" which was a "crime of universal concern" such as "war crimes, crimes against humanity, and genocide." ROA.105. According to the district court, "[t]ransporting aliens in violation of § 1324(a)(1)(A)(ii) is not akin to such crimes." ROA.105.

Finally, the district court rejected the government efforts to focus on "immigration aspects of the slave trade." ROA.105. To do so, the district court stated would overlook the "the harsh reality of injustice and violence wrought upon its victims." ROA.105. While the district acknowledged "there are some similarities between Palomares' predicate offense and the proposed historical analogue," it nevertheless granted the motion to dismiss because the analogues were not sufficient. ROA.105-06.

## SUMMARY OF ARGUMENT

The district court's order dismissing the § 922(g)(1) count against Palomares should be reversed. Section 922(g)(1) is constitutional under the Second Amendment as applied to Palomares. Palomares was previously convicted of transporting an illegal alien. This human smuggling offense is intrinsically dangerous. Under this Court's

precedent, an individual convicted of an intrinsically dangerous felony can be disarmed under § 922(g)(1) without violating the Second Amendment.

Moreover, Palomares's conviction is analogous to human trafficking that was severely punished at the time of the Founding. Specifically, individuals who trafficked people of color into the country to make them slaves were punished with death around the time of the Founding. Therefore, the district court should have denied his as-applied Second Amendment challenge.

## **ARGUMENT**

### I. **The Standard of Review**

This Court reviews an as-applied challenge to § 922(g)(1) "*de novo*." *United States v. Kimble*, 142 F.4th 308, 310 (5th Cir. 2025). And "[b]ecause the Second Amendment analysis is a legal inquiry into the text and history related to the relevant regulation, the government may provide additional legal support for its arguments on appeal." *United States v. Morgan*, --- F.4th ----, 2025 WL 2233205, at *5 (5th Cir. Aug. 6, 2025) (quoting *United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024)); *United States v. Clark*, --- F.4th ----, 2025 WL 2417117, at *3 (5th

Cir. Aug. 21, 2025) (rejecting the defendant's argument "that because the government did not rely on his probation status at the district court, it cannot do so on appeal"). Put simply, "in the context of as-applied challenges to § 922(g)(1)," this Court has "adopted a more lenient" pleading standard. *United States v. Barrow*, No. 24-10155, 2025 WL 1984267, at \*2 n.1 (5th Cir. July 17, 2025) (unpublished).

## II.    The Second Amendment and Felons Generally

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Although the Second Amendment "conferred an individual right to keep and bear arms," *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), the right "is not unlimited" and it remains subject to "lawful regulatory measures." *Id.* at 626, 627 n.26.

A modern firearm regulation is assessed by first asking whether the Second Amendment's plain text covers the proscribed conduct. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). If it does, the Government must "justify its regulation by demonstrating that it is

consistent with the Nation's historical tradition of firearm regulation."
*Id.*; *see also United States v. Rahimi*, 602 U.S. 680 (2024).

Section 922(g)(1) prohibits the possession of firearms by felons. This Court has ruled that § 922(g)(1) does not violate the Second Amendment on its face but may be unconstitutional as applied to certain felons. *Diaz*, 116 F.4th at 472 n.4.[6]

## III. Palomares's as-applied challenge should have failed because he was convicted of an inherently dangerous felony.

"The Second Amendment allows Congress to disarm classes of people it reasonably deems dangerous." *Kimble*, 142 F.4th at 314-15. A review of the "historical record demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Bullock*, 123 F.4th at 185 (quotations omitted) (citing *Kanter v. Barr*, 919 F.3d 437,

---

[6] The government maintains this Court, in *Diaz*, adopted a narrower approach to the historical analysis than is appropriate under *Bruen* and *Rahimi*. Felons may be categorically disarmed consistent with our Nation's historical tradition of firearm regulation at *Bruen*'s Second Step, and, therefore, § 922(g)(1) is not suspectable to as-applied Second Amendment challenges. *See United States v. Hunt*, 123 F.4th 697, 705-08 (4th Cir. 2024), *cert. denied*, No. 24-6818, 2025 WL 1549804 (June 2, 2025); *United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024), *cert. denied,* No. 24-6517, 2025 WL 1426707 (May 19, 2025); *Vincent v. Bondi*, 127 F.4th 1263 (10th Cir. 2025); *United States v. Dubois*, 139 F.4th 887 (11th Cir. 2025); *United States v. Duarte*, 137 F.4th 743 (9th Cir. 2025); *Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025). The government recognizes this Court has rejected the argument that a defendant's status as felon is alone sufficient to justify disarmament and raises it solely for purposes of preservation.

451 (7th Cir. 2019) (Barrett, J., dissenting)); *see also United States v. Schnur*, 132 F.4th 863, 868-70 (5th Cir. 2025). Indeed, preventing dangerous individuals from possessing firearms is not only consistent with history, but is also "consistent with common sense." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting).

From this principle, this Court has determined that Congress may disarm those who have been convicted of "an intrinsically dangerous felony." *Kimble*, 142 F.4th at 312. Holding that drug trafficking met this standard, this Court recognized a consensus regarding "the dangerous combination of drugs and guns." *Id.* at 317. In making that determination, this Court explained drug trafficking offenses are categorically dangerous without making "an individualized assessment" of any particular felon's history and characteristics. *Id.* at 318.

Like drug trafficking, human smuggling is an intrinsically dangerous felony. Indeed, this Court has already explained that alien smuggling is "inherently dangerous and often results in death and injury to both aliens and government agents." *United States v. Mendez*, 431 F.3d 420, 428 (5th Cir. 2005); *see also United States v. Jurado-Garcia*, No.

5:18-CR-10, 2018 WL 1411260, at *4 (S.D. Tex. Mar. 21, 2018), *aff'd,* 775 F. App'x 175 (5th Cir. 2019) (unpublished).

Much of the human smuggling business along the Mexico border is controlled by drug trafficking organizations, colloquially known as cartels. Edgar Sandoval, *A Chilling Scream, Then the Discovery of 53 Dead and Dying Migrants*, The NY Times (Mar. 13, 2025), https://www.nytimes.com/2025/03/13/us/politics/migrants-smugglers-trial.html. Cartels smuggle migrants across the border and, in many cases, into the United States in exchange for payment or, sometimes, ransom. Marshall B. Lloyd, *Los Vaqueros, Coyoteros, y Pollos: Combating Human Smuggling Beyond the Border*, 58 Tulsa L. Rev. 245, 247 (2023). Cartels use "increased violence to maintain, and seize, new international trade routes and corridors in order to facilitate the international transportation of contraband and immigrants." Aaron M. Munoz, *Silver, Secret Drug Wars, & Selfies: The United States' Justification for the Use of Force Against the Mexican Drug Cartels*, 41 W. State Univ. L. Rev. 643, 646 (2014). This includes violence in the United States. *Id.* at 646-47. Even if not every offense of transporting aliens illegally within the United

States involves organized crime, many, if not most instances of alien transport and human smuggling, do.

More fundamentally, since cartels largely control human smuggling along the southern border, most instances of transporting aliens involve at least some nexus to organized crime. Grayson Quay, *The Dangerous Journeys of Undocumented Migrants*, The Week (June 29, 2022), https://theweek.com/immigration/1014718/the-dangerous-journeys-of-undocumented-migrants ("Smugglers . . . are often affiliated with violent drug cartels."). And this nexus between trafficking and organized crime makes it, like drug trafficking, intrinsically dangerous. Indeed, this Court noted that "drug dealing is notoriously linked to violence." *Kimble*, 142 F.4th at 316 (cleaned up). The same connection exists for the human smuggling business, which has become a billion-dollar business. Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, The N.Y. Times (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.

The danger inherent to the crime of transporting aliens takes various forms. Those smuggled often face exploitation in the form of

15

"theft, assault, threats, kidnapping (to extort more money), or ransom." Katherine Drabiak, *How Distorting Asylum Law Affects Health & Safety at the Border*, 22 Ind. Health L. Rev. 215, 276 (2025).

Additionally, the method of transport can be dangerous. This Court has explained that "that transporting aliens in the trunk or engine compartment of a motor vehicle, carrying substantially more aliens than the rated capacity of the motor vehicle or vessel, or harboring aliens in a crowded, dangerous, or inhumane condition, are all examples involving situations that pose inherently dangerous risks to the aliens being transported." *United States v. Mateo Garza*, 541 F.3d 290, 293-94 (5th Cir. 2008) (cleaned up).

The United States Sentencing Commission has promulgated several sentencing enhancements recognizing the dangers inherent to alien smuggling. U.S.S.G. § 2L1.1(b)(1-9). These sentencing enhancements address the dangers involved in alien smuggling. For instance, U.S.S.G. § 2L1.1(b)(5) "applies to a wide variety of conduct" that is described as posing "inherently dangerous risks to the aliens being transported." *United States v. Garcia-Guerrero*, 313 F.3d 892, 896 (5th Cir. 2002); *see also United States v. Solis-Garcia*, 420 F.3d 511, 513-16

16

(5th Cir. 2005). Given the nature of such an offense, it is appropriate to consider transporting aliens a dangerous crime. *See Mendez*, 431 F.3d at 428.

In sum, Palomares's criminal history includes a felony conviction for inherently dangerous conduct, transporting illegal aliens. This Court should find § 922(g)(1) constitutional as applied to him and reverse the district court's order. *See United States v. LeBlanc*, No. 24-30036, 2025 WL 2218881, *3 (5th Cir. Aug. 5, 2025) (unpublished).[7]

## IV.    Alternatively, Palomares's as-applied challenge should fail because he was convicted of a crime analogous to a crime that was severely punished at the time of Founding.

This Court has also held the government may also defeat an as-applied challenge to § 922(g)(1) by demonstrating the defendant has a predicate felony conviction for an offense that 1) is analogous to a

---

[7] While this Court does not conduct an individualized assessment under *Kimble*, the facts underlying Palomares's transporting conviction confirm the inherent dangerousness of human smuggling. *See* Final Presentence Investigation Report, *United States v. Palomares*, No. 2:21-CR-690-1 (S.D. Tex., Nov. 08, 2021) (Dkt. No. 26 [PSR ¶¶ 6-11, 22]). This Court may take judicial notice of court filings in other proceedings. *See, e.g.,* Fed. R. Evid. 201(b); *Colonial Oaks Assisted Living Lafayette, L.L.C. v. Hannie Dev., Inc.*, 972 F.3d 684, 688 n.9 (5th Cir. 2020); *United States v. Davis*, 108 F. App'x 131, 134 n.4 (5th Cir. 2004) (unpublished). Notably, a statement was filed indicating Palomares did not object to Probation's report prior to sentencing. *See* Addendum to the Final Presentence Investigation Report, *United States v. Palomares*, No. 2:21-CR-690-1 (S.D. Tex., Nov. 08, 2021) (Dkt. No. 27).

founding-era felony and 2) the founding-era felony carried a severe punishment comparable to § 922(g)(1). *Diaz*, 116 F.4th at 467; *United States v. Contreras*, 125 F.4th 725, 731 (5th Cir. 2025) (explaining that *Diaz* requires a showing "that someone convicted of an analogous felony was punished in a comparable way").

At least two forms of founding-era punishments are comparable to the punishment imposed by § 922(g)(1): the death penalty and estate fortfeiture. *Diaz*, 116 F.4th at 467. Both are "relevantly similar" to § 922(g)(1) since each was enacted "to deter violence and lawlessness" and "achieved their goals by permanently punishing offenders." *Id.* at 469. "Capital punishment is obviously permanent," and many estate forfeiture laws "did not provide an opportunity for offenders to regain their possessions." *Id.* at 469. Therefore, the "lesser restriction of permanent disarmament that § 922(g)(1) imposes" does not violate the Second Amendment when applied to a defendant who, at the time of the founding, would have faced the death penalty or estate fortfieture for his prior criminal convictions. *See Id.* at 469.

In *Diaz*, this Court specifically identified historical laws that imposed the death penalty and estate fortfieture for theft. *Id.* at 468-69.

18

Those laws "establish that our country has a historical tradition of severely punishing people like Diaz who have been convicted of theft." *Id.* at 468-69. Therefore, § 922(g)(1) was not unconstitutional as applied to him. *Id.* at 471.

Around the time of the founding, the federal government severely punished individuals who engaged in human trafficking. A survey of early federal law demonstrates "that before 1868 Congress [] regulated immigration and prohibited some classes of free people from being brought to the United States." *See* Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215, 2228 (2021). In 1807, smuggling people of color into the United States for the purposes of making them a slave became a crime. Act of Mar. 2, 1807, ch. 22, 2 Stat. 426 (1807). Individuals who were smuggled into the country could be deported, specifically to Africa. Act of Mar. 3, 1819, ch. 101, 3 Stat. 532 (1819). In 1820, the federal government made the death penalty the punishment for individuals who violated these laws while declaring that such acts constituted the crime of piracy. Act of May 15, 1820, ch.

19

113, 4 Stat. I (1820) (providing violators "shall suffer death"). [8] A slave trader named Nathaniel Gordon was executed pursuant to an 1823 version of the law. *See Ex Parte Gordon*, 66 U.S. 503 (1861) (denying Gordon's request to stop his execution).[9]

Palomares's as-applied challenge fails because his underlying conviction of transporting undocumented aliens is sufficiently analogous to these founding-era human smuggling laws. Both involved the transport of foreigners into and through the country in violation of federal law. Individuals who engaged in the transatlantic slave trade did so for monetary gain by selling people into slavery. Human smuggling

---

[8] The analogy does not fail because the death penalty was not imposed until 1820. One would not expect to find earlier laws prohibiting the transatlantic slave trade since the Constitution specifically prohibited such regulations until 1808. U.S. Const. art. 1, § 9, cl. 1. Notably, the federal government banned human smuggling *vis-à-vis* the transatlantic slave trade immediately after the Constitution's prohibition expired and, shortly thereafter, imposed the death penalty for those who violated that law. Act of Mar. 2, 1807, ch. 22, 2 Stat. 426 (1807); Act of May 15, 1820, ch. 113, 4 Stat. I (1820). Also, post-ratification history can help in *Bruen*'s analysis. *See Rahimi*, 602 U.S. at 725 (Kavanaugh, J., concurring) ("[T]he Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text."); *see also id.* at 738 (Barrett, J., concurring) (noting that post-ratification history can be "an important tool").

[9] That human smuggling was punished by death is consistent with English regulations during the colonial period that punished with death the smuggling of goods into the colonies. *See* The Offences against Customs or Excise Act, 19 Geo. 2. c. 34 (1745). It is also consistent with the First Congress's law that made piracy punishable by death. *See* An Act for the Punishment of Certain Crimes Against the United States, ch.9, § 9, 1 Stat. 112, 114 (1790).

today is often carried out for financial gain. Further, modern illegal aliens and the victims of the transatlantic slave trade could be deported once discovered by authorities.

That the nature of human trafficking during the founding-era and the laws prohibiting it may differ in certain respects from modern circumstances and laws is not fatal to the analogy. The Supreme Court has specifically warned against being too formalistic in "historical analogue" comparisons. *Bruen*, 597 U.S. at 27 (stating that cases implicating "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach"). Analogical reasoning under the Second Amendment" is not a "regulatory straightjacket": it "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Bruen*, 597 U.S. at 30 (emphasis deleted). The "historical analogy" test requires only that modern laws are "consistent with the *principles* that underpin our regulatory tradition" and are "relevantly similar to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (cleaned up). The test does not require "dead ringers" or exact copies of founding era laws. *Id.* (cleaned up).

21

The district court's analysis ran afoul of these principles. Despite noting similarities between Palomares's predicate conviction and Founding-era human trafficking laws, ROA.105-06, it nevertheless determined those Founding-era laws were more analogous to federal laws that penalize kidnapping individuals and subjecting them to forced labor. ROA.104. In so doing, the district court construed the analogy too narrowly, effectively requiring a historical twin.

On that point, this Court's decision in *Bullock* is instructive. Bullock was convicted of aggravated assault and manslaughter. *Bullock*, 123 F.4th at 184. In citing the fact that such serious crimes were akin to those punished severely at the founding, this Court likened Bullock's predicates to "homicide, a prototypical common law felony." *Id.* at 184. This Court then cited An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 113, Sec. 3 (1790) and noted the First Congress punished murder on federal lands with death. *Id.* Importantly, that statute also made manslaughter on federal lands a felony but did not punish it with death. An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 113, Sec. 7 (1790). Nevertheless, this Court did not feel constrained to only consider the

22

manslaughter provision but also noted the similarity between Bullock's offenses and murder, *Bullock*, 123 F.4th at 185, despite murder being arguably more serious.

So too here. While the Founding-era human trafficking laws involve more extreme circumstances and may involve more force than modern day immigration offenses related to human smuggling, the underlying principles of these statutes are sufficiently similar under *Bruen* and *Rahimi. Cf. United States v. Harrison*, No. 23-6028, 2025 WL 2452293, at *23 (10th Cir. Aug. 26, 2025) (explaining that under *Bruen* and *Rahimi* certain "[h]istorical laws…may be imperfect sources, but…are [nevertheless] instructive…"). This Court has emphasized that "[t]he Supreme Court made clear in *Rahimi* that *Bruen* was not meant to suggest a law trapped in amber." *United States v. Betancourt*, 139 F.4th 480, 484 (5th Cir. 2025) (rejecting defendant's as-applied challenge to § 922(g)(1)) (cleaned up). Therefore, Palomares's disarmament under § 922(g)(1) is justified because his predicate conviction is akin to a crime that was severely punished at the time of the Founding. *See Diaz*, 116 F.4th at 471.

Given the similarities between modern human smuggling laws and Founding-era human trafficking laws and the fact that human trafficking was punished by death around the time of the founding, this Court should reverse the district court's order. *See LeBlanc*, 2025 WL 2218881 at *3.

## CONCLUSION

This Court should reverse the district court's dismissal order and remand for the reinstatement of the first count of the indictment.

Respectfully submitted,

NICHOLAS J. GANJEI
United States Attorney

CARMEN CASTILLO MITCHELL
Chief, Appellate Division

s/ *Kristian D. Amundsen*
KRISTIAN D. AMUNDSEN
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
Phone: (713) 567-9102
Fax: (713) 718-3302

ATTORNEYS FOR APPELLANT

# CERTIFICATE OF SERVICE

I, Kristian D. Amundsen, Assistant United States Attorney, hereby certify that on August 29, 2025, an electronic copy of the Appellant's Brief was served by notice of electronic filing via this court's CM/ECF system upon opposing counsel, Assistant Federal Public Defender Evan G. Howze.

Upon notification that the electronically filed brief has been accepted as sufficient, and upon the Clerk's request, seven paper copies of this brief will be placed in the United States Mail, postage prepaid, addressed to the Clerk. *See* 5th Cir. R. 25.2.1, 31.1; 5th Cir. ECF filing standard E(1).

s/ *Kristian D. Amundsen*
KRISTIAN D. AMUNDSEN
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains approximately 4,584 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in Century Schoolbook font, 14 point font for text and 12 point font for footnotes.

3.  This brief complies with the privacy redaction requirement of 5th Cir. R. 25.2.13 because this brief has been redacted of any personal data identifiers.

4.  This brief complies with the electronic submission of 5th Cir. R. 25.2.1, because this is brief is an exact copy of the paper document.

5.  This brief is free of viruses because this brief has been scanned for viruses with the most recent version of the McAfee Endpoint Security scanning program.

s/ *Kristian D. Amundsen*
KRISTIAN D. AMUNDSEN
Assistant United States Attorney
Date: August 29, 2025

26